# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | Docket No. 2:15-CR-175-GZS |
| | ) | |
| **JOEL A. SABEAN, M.D.** | ) | |

## MOTION TO SUPPRESS STATEMENTS OF DEFENDANT

**COMES NOW**, the Defendant Joel A. Sabean, M.D. ("Dr. Sabean"), by and through his undersigned attorneys, and hereby moves to suppress statements made by the Defendant to Government investigators on or about January 29, 2014.

## I.     FACTUAL BACKGROUND

The evidence will establish the following facts.   On October 20, 2015, a grand jury indicted Dr. Sabean on five counts of tax evasion relating to funds provided by Dr. Sabean to his adult daughter, Shannon Sabean, for her purported medical expenses and thereafter deducted on his income tax returns.   *See Indictment* (Docket No. 1).[1]   The Indictment was the culmination of a multi-year grand jury investigation conducted by the United States Attorney's Office for the District of Maine and the Internal Revenue Service.

On January 15, 2014, Government agents interviewed Patricia A. Kuhl, Dr. Sabean's practice manager and custodian of records.   Ms. Kuhl has served in that capacity for nearly twenty years and for several of those years also served as his trustee under the Joel A. Sabean Trust.   That same day, the Government also served Ms. Kuhl with a grand jury subpoena, issued at the request of the United States Attorney for the District of Maine, requesting, *inter alia*, "[a]ll

---

[1] The Grand Jury also indicted Dr. Sabean on 51 counts of unlawful distribution of non-narcotic controlled substances and a single count of health care fraud relating to prescriptions he allegedly wrote for his wife.   The Defendant seeks to sever the tax evasion charges from these prescription fraud charges by separate motion.   *See* Docket No. 25.

correspondence with [Dr. Sabean or Shannon Sabean] and/or third parties regarding [Dr. Sabean and Shannon Sabean]."  *See Jan. 15, 2014 Grand Jury Subpoena Served on PK Associates*, attached hereto as Exhibit A (the "Grand Jury Subpoena").

At the outset of the interview, Ms. Kuhl told the IRS Special Agents that Michael Sheehan, Esquire of Preti Flaherty represented Dr. Sabean with respect to all tax matters, including specifically the medical deductions at issue.  *See Affidavit of P. Kuhl* at ¶ 7, attached hereto as Exhibit B ("Kuhl Affidavit").   At the conclusion of the interview, the Government instructed Ms. Kuhl not to inform Dr. Sabean or his representatives about its ongoing investigation, its interview with Ms. Kuhl, or the Grand Jury Subpoena, notwithstanding the fact that they intended to seize records belonging to Dr. Sabean's medical practice.  *See id.* at ¶ 9.  Special Agent Fitzgerald's notes confirm this demand.   During a follow-up phone conversation sometime between January 16th and 18th, Special Agent Fitzgerald reiterated her instruction and further warned Ms. Kuhl that she should contact the Government if any member of Dr. Sabean's "defense team" tried to "intimidate" her.   *Id.* at ¶ 12.

On January 21, 2014, Special Agents Fitzgerald and Rogers again visited Ms. Kuhl in order to ascertain when the records requested by the Grand Jury Subpoena would be ready for production.  *Kuhl Aff.* at ¶ 13.   Ms. Kuhl expressed to Special Agent Fitzgerald her concern that the documents requested by the subpoena would include communications with Attorney Sheehan and others that were clearly marked as "privileged."   *Id.*   Special Agent Fitzgerald stated to Ms. Kuhl that she could not invoke any privilege protection with regard to the Grand Jury Subpoena's demand for production of all records in Ms. Kuhl's possession, including any marked "privileged."   *Id.* at ¶ 14.   Based on that instruction, Ms. Kuhl began to compile for production all

files in her custody that were responsive to the subpoena.  *Id.*  These records included facially privileged communications with Attorney Sheehan concerning his representation of Dr. Sabean on tax matters, including specifically records involving Attorney Sheehan's retention of the Florida firm Sheer & Associates ("Sheer"), private investigators Attorney Sheehan had hired specifically to investigate the veracity of Shannon Sabean's claimed medical expenses (the "Sheer Investigation").  *Id.* at ¶ 13.[2]

Notes taken by the Government's investigators during their January 21, 2014 meeting with Ms. Kuhl confirm that the Government knew Dr. Sabean was represented by Attorney Sheehan. For example, Special Agent Fitzgerald's notes of the conversation begin with the inscription "Atty."  *See Jan. 21, 2014 Handwritten Interview Notes Taken by SA Fitzgerald* at 1, attached hereto as Exhibit D.  The same notation appears underlined on the next page of her notes.  *See id.* at 2.  Special Agent Rogers notes provide context for Special Agent Fitzgerald's notations:

> -The atty – Mike Sheehan, were uncomfortable – potential atty/client privilege issue – explained to Pat + Ray [Kuhl, Ms. Kuhl's husband.]

*See Jan. 21, 2014 Handwritten Interview Notes Taken by SA Rogers* at 2, attached hereto as Exhibit E.  Undated notes (likely from January 15th) indicate that the IRS Special Agents knew the identity of Sheer and that Ms. Kuhl was "putting records together" relating to the Sheer Investigation.  *See Undated Notes "From Judy,"* attached hereto as Exhibit F.

At the conclusion of the January 21, 2014 meeting, Special Agent Fitzgerald again instructed Ms. Kuhl not to inform Dr. Sabean of the Government's investigation.  *Kuhl Aff.* at ¶ 15. Based on Special Agent Fitzgerald's instructions, Ms. Kuhl did not inform Dr. Sabean or

---

[2] Defense counsel has since had an opportunity to review these records and has identified hundreds of privileged communications, many of which involved Attorney Sheehan and some of which involve the Sheer Investigation.  *See Privilege Log,* attached hereto as Exhibit C.

Attorney Sheehan about the Government's investigation, the Grand Jury Subpoena or the fact that she had been interviewed by Government Agents. *Id.* Ms. Kuhl finished producing responsive documents to the Government on or before Monday, January 27, 2014, documents that included privileged records pertaining to the Sheer Investigation. *See id.* at ¶ 16.

On January 29, 2014 – after obtaining privileged records from Ms. Kuhl and without the prior knowledge or consent of Attorney Sheehan – Special Agents Coviello and Fitzgerald interviewed Dr. Sabean at his office. *See Jan. 29, 2014 Mem. of Interview*, attached hereto as Exhibit G. According to Special Agent Fitzgerald's interview memorandum, the Government did not ask Dr. Sabean if he was represented by counsel or otherwise inform him of his right to consult an attorney before speaking with the Government's investigators, despite Ms. Kuhl's prior representation that Dr. Sabean was represented by counsel on the very subject of the Government's investigation. *See generally id.* Notwithstanding Ms. Kuhl's rejected attempt to assert the attorney-client privilege with respect to the topic, Special Agents Coviello and Fitzgerald questioned Dr. Sabean about the Sheer Investigation. *See id.* at 2, 6-7. Indeed, it appears that Special Agent Fitzgerald arrived at Dr. Sabean's office with prepared script of questions on the subject: "Who is SHEER and Associates? Sheer Investigations? What are these payments for? What was result? Consent to obtain these files?" *See Notes of Jan. 29, 2014 Interview Prepared by SA Fitzgerald* at 2, attached hereto as Exhibit H.

Not only did the Government interview a party it knew to be represented without the consent or knowledge of his attorney, it took matters a step further. During its interview of Dr. Sabean on January 29, 2014, the Government asked him to sign the following waiver of rights:

> I specifically waive any rights or privileges I have in relation to any and all results of the Private Investigator Sheer and Associations or Sheer Investigations. I understand I am under no obligation

> to waive these rights, and I do so without any promises given to me by IRS investigators.  I understand there might exist an attorney/client privilege and I specifically waive that right.

*See Jan. 29, 2014 Privilege Waiver*, attached hereto as Exhibit I; *Ex. G* at 7.  Dr. Sabean specifically asked the Special Agents whether "he should sign" the document, to which the Government responded that they could not advise him one way or the other.  *Ex. G* at 7.  There is no indication that the Special Agents advised Dr. Sabean of his right to seek the opinion of counsel.  Without that benefit, he signed the waiver.  *See id.*

The United States Attorney's Office did not inform Attorney Sheehan of the Government's investigation until after it had completed its January 29, 2014 interview of Dr. Sabean.  On January 31, 2014, Assistant United States Attorney Michael Conley informed Attorney Sheehan that the Government had formed a so-called "taint" team "to ensure that certain privileged material does not reach prosecutors and agents handling the investigation involving your client" and asked Attorney Sheehan whether he intended to assert the privilege over the Sheer materials.  *See Jan. 31, 2014 Email from AUSA Conley to Sheehan*, attached hereto as Exhibit J.  Although Attorney Sheehan responded affirmatively on February 7, 2016, Assistant United States Attorney David Joyce nevertheless sent Attorney Sheehan a copy of a grand jury subpoena issued to Sheer acknowledging that Attorney Sheehan had asserted privilege over the requested documents but requesting their production to the Government's "taint" team regardless.  *See G.J. Subpoena to Sheer* at 2, attached hereto as Exhibit K (the "Sheer Subpoena").[3]  Worried that Sheer would

---

[3] The Subpoena requested the following documents:

Any and all records, documents, information, video surveillance, or other data relating to:

1.      Any investigations or services provided by [Sheer] at the request of Dr. Joel Sabean . . . . [and]
2.      Any investigations or services involving Shannon Sabean . . . .

5

nevertheless comply with the Government's demand, Dr. Sabean, through undersigned counsel, moved to quash the Sheer Subpoena on February 21, 2014.[4]   On September 28, 2014, the Court granted Dr. Sabean's Motion.   *See generally Mem. Decision & Order on Mot. to Intervene & Quash* (Docket No. 18), *In re Joel A. Sabean, M.D.*, No. 2:14-mc-18-JHR (Docket No. 18) (Filed Under Seal).   The Court (Rich, M.J.) found that the files subpoenaed from Sheer were indeed protected by the attorney-client and/or work product privileges and were generated in anticipation of litigation involving the very deductions the Government was investigating.

Dr. Sabean now moves to suppress the statements he made to the Government on January 29, 2014 on grounds that the statements were obtained through an unauthorized and unlawful interview of a person the Government knew was represented with respect to the subject matter of the investigation, that is, Dr. Sabean's medical deductions.

## II.   LEGAL STANDARD

The Citizens Protection Act provides that "[a]n attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State."   28 U.S.C. § 530B(a) (the "McDade Amendment").   *See also* D. Me. Local Rule 83.3(d).   Under the McDade Amendment, the District of Maine's Local Rules and Rule 4.2(a) of the Maine Rules of Professional Conduct, "a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another

---

*See Ex. K* at 6.   The Sheer Subpoena did not request testimony from any person or persons who performed such services.   The Subpoena also did not delineate a timeframe for its records request or limits its scope to exclude privileged communications, which the Government was well aware existed at this point.

[4] During the briefing process on the Motion to Quash, AUSA Conley represented to the undersigned that the Government did not intend to rely on Dr. Sabean's written "waiver" of rights for purposes of the motions then pending, but he made no such representation concerning any future use of the "waiver" for other purposes.

lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order."   M.R. Prof. Conduct 4.2(a).[5]

It is axiomatic that "[a] lawyer may not make a communication prohibited by this Rule through the acts of another."   M.R. Prof. Conduct 4.2, cmt. 4.   *See also* M.R. Prof. Conduct 8.4(a), cmt. 1 ("Lawyers are subject to discipline when they violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so or do so through the acts of another, as when they request or instruct an agent to do so on the lawyer's behalf.").   Accordingly, if a Government attorney or agent "knows a person is represented with respect to the matter under investigation," that attorney or agent "shall not communicate directly with that person absent consent of the other lawyer or a court order...." M.R. Prof. Conduct 4.2(c).   Any evidence obtained in violation of this Rule may be suppressed at the Court's discretion.   *See United States v. Hammad*, 858 F.2d 834, 839 (2d Cir. 1988); *cf. United States v. Thomas*, 474 F.2d 110, 112 (10th Cir. 1973) ("[O]nce a criminal defendant has either retained an attorney or had an attorney appointed for him by the court, any statement obtained by interview from such defendant may not be offered in evidence for any purpose unless the accused's attorney was notified of the interview which produced the statement and was given a reasonable opportunity to be present.").

## III.   ARGUMENT

Whether Rule 4.2 (the "no-contact" Rule) applies to prosecuting attorneys during all pre-indictment investigations in this Circuit appears to be a question of first impression.   Other Circuits are split on the issue.   The Second and Ninth Circuits have held that the no-contact rule

---

[5] "The Rule applies even though the represented person initiates or consents to the communication. A lawyer must immediately terminate communication with a person if, after commencing communication, the lawyer learns that the person is one with whom communication is not permitted by this Rule."   M.R. Prof. Conduct 4.2, cmt. 3.

can apply to "pre-indictment, non-custodial contacts with represented persons" in certain circumstances. *Hammad*, 858 F.2d at 839-40; *United States v. Talao*, 222 F.3d 1133, 1138-39 (9th Cir. 2000). Other Circuits have ruled that the no-contact rule applies prior to indictment in the custodial context. *See, e.g.*, *Thomas*, 474 F.2d at 112; *United States v. Durham*, 475 F.2d 208, 211 (7th Cir. 1973) (custodial, pre-indictment interview of a defendant in the absence of retained counsel "raise[s] ethical questions"). Still others hold that the no-contact rule applies only after the institution of judicial proceedings. *See, e.g.*, *United States v. Ryans*, 903 F.2d 731, 739 (10th Cir. 1990) ("'The no-contact rule' was not intended to preclude undercover investigations of unindicted suspects merely because they have retained counsel."). Despite the lack of established First Circuit precedent on the subject, a careful review of the law reveals that the no-contact rule unquestionably applied to the Government's January 29, 2014 interview of Dr. Sabean.

### A.   *M.R. Prof. Conduct 4.2 Applied to the Government's Pre-Indictment Investigation of the Defendant.*

Most of the cases allowing pre-indictment, non-custodial interviews of represented persons were decided before the 1998 passage of the McDade Amendment, which applies with equal force to prosecutors *and* their agents. *See* 28 C.F.R. § 77.4(f) ("A Department attorney shall not direct an investigative agent acting under the attorney's supervision to engage in conduct under circumstances that would violate the attorney's obligations under section 530B."). The McDade Amendment had a substantial impact on Rule 4.2's application to pre-indictment investigations:

> Considering that the McDade Amendment was principally designed to dismantle the DOJ's policy of authorizing pre-indictment *ex parte* interrogation by federal prosecutors and their agents of represented criminal suspects, the argument that such post-McDade Amendment interrogations in the course of legitimate criminal investigations are 'authorized by law' is, at best, disingenuous. To the extent that such interrogations were at one time authorized by the regulations of the DOJ, the McDade Amendments vitiate those regulations.

*United States v. Bowman*, 277 F. Supp. 2d 1239, 1243 (N.D. Ala. 2003), *vacated based on plea*

8

*agreements,* No. CR-03-C-0056-E, 2003 WL 23272667 (N.D. Ala. Sept. 12, 2003). *See also Federal Prosecutors, State Ethics Regulations, and the McDade Amendment*, 113 HARV. L. REV. 2080, 2080 & 2091 (2000) (calling the McDade Amendment "the most significant change in the ethics regulation of federal prosecutors in more than twenty years" and explaining how the Amendment "requires federal prosecutors to comply with state ethics guidelines without regard for other federal interests at stake").   The McDade Amendment, in other words, broadens the application of the no-contact rule and prohibits contact with represented parties in the pre-indictment, non-custodial context.   *See, e.g.*, *Bowman*, 277 F. Supp. 2d at 1243 (suppressing pre-indictment statements made to investigators in violation of the no-contact rule); *United States v. Thomas*, 39 F. Supp. 3d 1015, 1024 (N.D. Ill. 2014) ("Rule 4.2 applies to prosecutors prior to the filing of formal charges.").

   *United States v. Koerber*, 966 F. Supp. 2d 1207 (D. Utah 2013), is a well-reasoned explanation of how the legal landscape has changed.   *Koerber* asked the following question:

> [W]hat consequences, if any, follow a lead prosecutor's instructions to federal investigators to initiate pre-indictment *ex parte* contact with the target of their investigation who prosecutors know is represented by counsel, and to conduct multiple interviews of that person, including through use of questions scripted by the prosecutors and designed to influence the target to waive attorney-client privilege and disclose information about potential trial strategy such as reliance on an "advice of counsel" defense.   In doing so, the court must evaluate a relatively unique factual scenario and address abundant but in many cases inapposite case law.

*Id.* at 1213.   In *Koerber*, a defendant voluntarily appeared for two interviews with IRS and FBI agents investigating, *inter alia*, tax fraud allegations after a grand jury had been convened and grand jury subpoenas had been issued.   Although it should have been clear to the investigators that the defendant was represented after the first interview, the Government not only proceeded to conduct a second interview of the defendant but also posed scripted questions "designed to influence the target to waive [the] attorney-client privilege."   *Id.* at 1213, 1221, 1226.

9

The Court found that "based on the prosecutors' actual knowledge that Defendant was represented, they violated Rule 4.2 of the Utah Rules of Professional Conduct in authorizing the agents to contact him directly and conduct the interviews with him without obtaining consent from his counsel or court approval." *Id.* at 1213-14.  The Court reasoned that the recently-enacted McDade Amendment dictated that federal prosecutors and their agents must comply with the no-contact rule at *all* stages of their investigation.  *See id.* at 1225.  The Court distinguished the cases that held that "pre-indictment, non-custodial contacts by the government are within the 'authorized by law' language of Rule 4.2" by noting that they dealt with "*covert* investigation techniques in the noncustodial, pre-indictment investigation [stage]" and versions of the no-contact rule that were far narrower than Utah's version.  *See id.* at 1228-29, 1232.

The similarities between *Koerber* and the instant case are striking and compel the same conclusion.  First, Maine's version of Rule 4.2, like Utah's counterpart, refers to "a person the lawyer knows to be represented," not to a "party" to a pending proceeding.   M.R. Prof. Conduct 4.2(a); Utah R. Prof. Conduct 4.2(a).   As the *Koerber* court noted, a no-contact rule's use of the term "person" instead of "'party' is meaningful" because it signified the legislature's intent "that the rule should apply regardless of whether formal legal proceedings have been commenced." *Id.* at 1230.   Other courts have followed this logic.   *See In re John Doe, Inc.*, 194 F.R.D. 375, 377-78 (D. Mass. 2000) (noting that the "new Model Rule, (and the Massachusetts rule) is broader, applying to 'any person, whether or not a party to a formal adjudicative proceeding'" and granting an *ex parte* request that Government attorneys be allowed to make contact with represented parties under pre-indictment investigation, but specifically prohibiting those attorneys from inquiring or discussing "any communications protected by the attorney-client or work product privilege" and

ordering them to inform each represented party that the "person may request that the interview only take place in the presence of that person's personal attorney . . . and that request shall be honored"); *cf. United States v. Balter*, 91 F.3d 427, 436 (3d Cir. 1996) (relying on the use of the term "party" in New Jersey's version of Rule 4.2 to admit covertly recorded, pre-indictment conversation's with a represented person). Maine's version of the no-contact rule, which similarly opted to use the broad term "person" as opposed to the narrower term "party," distinguishes the instant case from cases like *United States v. Ryans* that hold that no-contact rules employing the term "party" do not apply to pre-indictment investigations. *See Koerber*, 966 F. Supp. 2d at 1229-32. *Koerber's* logic therefore compels the same result in this case.

Second – like *Koerber* but unlike cases from other circuits that have held that "undercover investigations of unindicted [represented] suspects" are permissible under the "authorized-by-law" exception to the no-contact rule, *see Ryans*, 903 F.2d at 739-41 – this case involved *overt* communications between a represented party and the Government. The *Koerber* court noted that "*Ryans* (and its progeny, including in other jurisdictions)" is "straightforwardly distinguishable" from cases like the instant one where "the Government initiated overt communications with Defendant rather than pursuing the investigation through the use of an undercover informant." *Koerber*, 966 F. Supp. 2d at 1229. *Compare also United States v. Ward*, 895 F. Supp. 1000, 1006 (N.D. Ill. 1995) ("In contrast to the covert use of informants, the Court finds the balance of competing interests weighs in favor of prohibiting overt contacts with represented parties for the purpose of discussing cooperation with the Government") *with Ex. G* at 9 (asking Dr. Sabean to make a covert phone call to his daughter).[6]

---

[6] Special Agent Fitzgerald also asked Ms. Kuhl to have a covert conversation with Dr. Sabean. *See Kuhl Aff.* at ¶ 10.

11

Indeed, unlike an undercover operation, this Court should "not accept that it is a 'well-established investigatory technique'" for Government investigators, having been previously informed that a target is represented, to:

> 1) inform the Defendant's practice manager that she could not assert the attorney client privilege;
>
> 2) instruct the practice manager to not contact her employer-physician about the fact of the Government's investigation;
>
> 3) interview the target without the knowledge of his legal counsel;
>
> 4) use scripted questions on topics over which a privilege had been asserted; and
>
> 5) induce the target to waive that privilege without giving him an opportunity to speak with his counsel.

*Cf. Koerber*, 966 F. Supp. 2d at 1232 (refusing to "accept that it is a 'well-established investigatory technique' for [Government investigators] to jointly interview a target known to be represented by counsel at the instruction of prosecutors who have previously attempted to subpoena the target to testify before a grand jury as the documents custodian for his companies …."). That is certainly not the law of any other Circuit, and it should not be the law of this one.

Third, like in *Koerber*, the Government interviewed Dr. Sabean after the United States Attorney's Office had assumed control of the investigation, as evidenced by the fact that a Grand Jury Subpoena signed by AUSA Joyce had been served on Dr. Sabean's practice manager two weeks prior. *See Ex. A*. Accordingly, "under [these] circumstances 'involving fully defined adversarial roles, impending grand jury proceedings, and awareness on the part of the responsible government actors of [the target's] ongoing legal representation,'" the no-contact rule applies. *Koerber*, 966. F. Supp. 2d at 1229, n.7 (quoting *Talao,* 222 F.3d at 1139)).

---

Special Agent's Fitzgerald's interview memorandum confirms this request.

Finally, the Court need not categorically decide whether Rule 4.2 applies to *all* pre-indictment investigations.  The facts of this case – specifically that the Government sought and obtained a waiver of the attorney-client privilege from the Defendant *after* the privilege was asserted by his practice manager – present a unique and inherently problematic situation that shifts the relationship between the Government's investigators and the Defendant squarely into the realm of circumstances that Rule 4.2 was designed to prevent.  *Cf. Hammad,* 858 F.2d at 840 (Holding that artfully contrived lawyer's devices – such as the privilege "waiver" at issue here – can shift the relationship between prosecutor and informant so that the informant becomes the prosecutor's alter ego and engages in communication proscribed by the no-contact rule); *Koerber*, 966 F. Supp. 2d at 1213 (holding that questions "designed to influence the target to waive attorney-client privilege" violated the no-contact rule).

> **B.** **The Government had Actual Knowledge of Attorney Sheehan's Representation of Dr. Sabean, which Must be Imputed to the Prosecution Team.**

Because the no-contact rule applied to the Government's interview of Dr. Sabean, the question becomes whether that rule was violated, i.e. whether the Government had actual knowledge that Dr. Sabean was represented with respect to the subject of his daughter's medical deductions.  In this case, Dr. Sabean's practice manager specifically informed the IRS Special Agents that Dr. Sabean was represented by counsel with respect to the tax deductions at issue. The Government's notes confirm they knew Attorney Sheehan represented Dr. Sabean, and the Government specifically warned Ms. Kuhl to call them if Dr. Sabean's defense team "intimidated" her.  The USAO also organized a "taint" team, something it would not have done if it did not realize Dr., Sabean was represented by counsel.  Put simply, there can be little doubt that this information was known to the United States Attorney's Office or otherwise can be imputed to it.

13

"[A]ctual knowledge [that a person is represented by counsel] may be inferred from the circumstances."  *See* M.R. Prof. Conduct 4.2, cmt. 8 (citing M.R. Prof. Conduct 1.0(f)).  As a practical matter, it is axiomatic that a grand jury investigation is conducted by and through the United States Attorney within the federal district in which the grand jury sits and that that the United States Attorney typically determines in the first instance which persons or entities will be served with grand jury subpoenas:

> Although the grand jury subpoena has been described as the 'court's process,' it is functionally a tool of the prosecutor, issued at the initiative of the United States Attorney, with no judicial participation. . . . [A]lthough grand jury subpoenas are occasionally discussed as if they were the instrumentalities of the grand jury, they are in fact almost universally instrumentalities of the United States Attorney's office or of some other investigative or prosecutorial department of the executive branch.

*In re Application of Credit Information Corp. of N.Y.*, 457 F. Supp. 969, 971 (S.D.N.Y. 1978) (quoting *In re Grand Jury Proceedings*, 486 F.2d 85, 89-90 (3d Cir. 1973)); *United States v. Cisneros*, 456 F. Supp. 2d 826, 865 (S.D. Tex. 2006) ("A grand jury may request evidence, but the function of issuing process to obtain it belongs to the prosecutor, who has the subpoena power to bring proof to the courthouse" (citing cases)).  Because "enforcement officials are agents of the prosecuting party," *Thomas*, 474 F.2d at 112, particularly after a grand jury has been convened, it must be presumed that when the IRS Special Agents met with and questioned Ms. Kuhl after serving her with a Grand Jury Subpoena, the investigators and the United States Attorney's Office were part of a joint prosecution-investigation team and, therefore, acting at the direction and with the authority of the United States Attorney. *See Koerber*, 966 F. Supp.2d at 1227; *United States v. McNaughton*, 848 F. Supp. 1195, 1202-03 (E.D. Pa. 1994) (In the absence of evidence that agents did not interview target with the knowledge and at the direction of the USAO, agents were presumed to act as the prosecutor's alter ego).  And it must be further presumed that any decision to interview Dr. Sabean, particularly with respect to materials obtained by that Grand Jury

Subpoena, was also made by the United States Attorney's Office.

If somehow Ms. Kuhl's statements to the Government are not enough to impute actual knowledge to the prosecution team, her statements "at the very least, should have prompted prosecutors or the interviewing agents, to reach out to the [defendant's attorney] . . . to confirm whether he was represented and, if so, whether counsel consented to his being interviewed outside of the presence of counsel." *Koerber*, 966 F. Supp. 2d at 1221. That the interviewing agents would not at least ask prosecutors whether they could still interview Dr. Sabean in light of all of the above is incredible – particularly after the agents documented a "potential atty/client privilege issue" with respect to the documents it had requested. Indeed, the Department of Justice's own guidelines governing overt communications with represented persons caution that:

> Many states' contact rules provide that *knowledge of a person's representation by counsel may be inferred from circumstantial evidence*. Therefore, Department attorneys should consider all of the facts and circumstances concerning possible representation and, in some situations, may need to inquire of the person to determine whether he is represented.

*See* 9 *United States Attorneys Manual* § 296(A) (emphasis supplied). Given that, while the United States Attorney's Office had responsibility for the investigation, the IRS Special Agents 1) knew that Dr. Sabean was represented by Attorney Sheehan on the very subject of their investigation; 2) nevertheless questioned Dr. Sabean extensively about a private investigation commission by Attorney Sheehan, suggests that the prosecutors and their agents already knew the answer to this critical question and chose to ignore it. *McNaughton*, 848 F. Supp. at 1202 ("Rule 4.2 bars communication by non-attorney government law-enforcement officers where those communications are made with the knowledge or at the direction of an attorney for the government."). It defies both widely recognized protocols employed in federal criminal investigations and common sense to suggest that the Special Agents simply would have taken

matters into their own hands in the face of these concerns.

Furthermore, the documents in the United States Attorney's Office's possession made references to the Sheer Investigation and included numerous privileged communications with Attorney Sheehan.  If the Government knew about the Sheer Investigation prior to its interview with Dr. Sabean, which it obviously did considering the questions it scripted, then the Government knew Dr. Sabean was represented by counsel.  *Cf. Koerber* 966 F. Supp. 2d at 1213; *United States v. Jacobs*, 650 F. Supp. 2d 160, 164 (D. Conn. 2009) ("A prosecutor is presumed to know all information gathered by his office in connection with an investigation of the case."). Furthermore, if the Government did not know Dr. Sabean was represented, it would not have confronted him with a well-crafted waiver of the attorney-client privilege – what privilege would there have been to waive?  Accordingly, the Court must infer that Attorney Sheehan's representation was known by the United States Attorney's Office.  *Cf. Hammad,* 858 F.2d at 840 (artfully contrived lawyer's devices can turn an agent into the alter-ego of the prosecutor).

In sum, the circumstances of this case compel an inference of actual knowledge.  Ms. Kuhl told the prosecutor's agents that Dr. Sabean was represented by counsel and that the prosecutor's Grand Jury Subpoena called for privileged communications.   Prior to their interview of Dr. Sabean, the prosecutor's agents told Ms. Kuhl to contact them if she was "intimidated" by Dr. Sabean's "defense team."   The prosecutors had communications in their possession that revealed that Dr. Sabean was represented by counsel, including privileged communications involving the Sheer Investigation.  According to its own handwritten notes, the Government questioned Dr. Sabean on the topic that they worried could invoke a "potential atty-client privilege issue" without first contacting Attorney Sheehan, even after Ms. Kuhl attempted to assert the

privilege and withhold the communications.   The Government even went so far as to convince Dr. Sabean to sign a document purporting to waive his rights to claim the privilege, something it would not have done if it did not understand that Dr. Sabean was represented by counsel.   Under these circumstances, it cannot be reasonably suggested that the Government did not have actual knowledge that Dr. Sabean was represented.

### C.      *Suppression is the Appropriate Remedy.*

The Court must craft an appropriate remedy that redresses the Government's significant and harmful violation of the no-contact rule.   Ms. Kuhl bluntly told the investigators that Dr. Sabean was represented by counsel with respect to the tax deductions at issue, which should have ended the Government's interview right there.   *Compare Kuhl Aff.* at ¶¶ 4, 7 *with* M.R. Prof. Conduct 4.2, cmt. 7 ("In the case of a represented organization, this Rule prohibits communications with a constituent of the organization who supervises, directs or regularly consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability.").

Instead, the Government not only completed its interview with Ms. Kuhl, but contacted her multiple times after that, each time instructing her not to tell Dr. Sabean about the Government's investigation.   The Government also told Ms. Kuhl to contact them if she was "intimidated" by Dr. Sabean's defense team, a statement clearly designed to intimidate *Ms. Kuhl* into not speaking with Dr. Sabean's attorney about the investigation.   Moreover, having been told that the prosecutor's Grand Jury Subpoena called for privileged communications, the Government ignored this assertion, told Ms. Kuhl she could not assert the privilege, seized Dr. Sabean's files (including

the privileged communications) without notifying Dr. Sabean's attorney, and proceeded to question Dr. Sabean on a topic the Government well-knew involved a "potential atty-client privilege issue" without the prior consent of his counsel.   The Government organized a "taint" team "to ensure that certain privileged material does not reach prosecutors and agents handling the investigation involving your client," *see Ex. J*, only *after* the Government seized Dr. Sabean's privileged files and interviewed him on privileged topics.   Even then, the Government continued to seek privileged materials from a third-party.

Moreover, the Government's conduct violated three rules *in addition* to the no-contact rule:   First, after being put on notice that the documents subpoenaed contained privileged communications, the Government should have contacted Attorney Sheehan and agreed on a procedure to segregate those materials from the others.   *Cf. Corey v. Norman, Hanson & DeTroy*, 1999 ME 196, ¶ 20, 742 A.2d 933 ("[a] lawyer who receives materials that on their face appear to be subject to the attorney-client privilege or otherwise confidential, under circumstances where it is clear they were not intended for the receiving lawyer, should refrain from examining the materials, notify the sending lawyer and abide the instructions of the lawyer who sent them" (quoting ABA Comm. on Ethics & Prof. Resp., Formal Op. 92-368 (1992)).   Second, the Government should have contacted Attorney Sheehan to find out whether he represented Dr. Sabean, a simple yet crucial step to ensure it did not violate Dr. Sabean's right to counsel.   *See* 9 *United States Attorneys Manual* § 296(A).   Third, the IRS should have informed Ms. Kuhl, and certainly Dr. Sabean, of their right to consult an attorney prior to questioning.   *See IRS Manual* § 9.4.5.11.3.1 (5.15.08) (Informing of Constitutional Rights in Non-Custodial Interviews) and § 9.4.5.11.3.1.1(2) (2.1.05) (Subject of Investigation).   Instead of abiding by these rules, the

Government conducted an *ex parte* interview of Dr. Sabean and caused him to waive the privilege, even *after* he explicitly asked them whether or not he should.   And worse, rather than give Dr. Sabean the opportunity to seek competent counsel, the Government forced Dr. Sabean into the position where he needed to ask *the Government* for legal advice.

Such egregious misconduct requires a corresponding remedy: the suppression of Dr. Sabean's entire statement to the Government on January 29, 2014.   The Government's willful violation of the no-contact rule – and therefore a federal statute, *see* 28 U.S.C. 530B(a) – violated the Defendant's right to due process under the Fifth Amendment.   *See Koerber*, 966 F. Supp. 2d at 1234, 1243 ("In violating Utah's no-contact rule . . . the prosecutors and agents also violated the [McDade Amendment], a *federal statute* protecting citizens' rights in precisely this situation, thereby implicating due process concerns ...").   The Government exacerbated this violation by violating its own agency rules.   *See id.* at 1234, 1242-45.[7]   Like in *Koerber*, the Government in this case "initiate[d] pre-indictment *ex parte* contact with the target of their investigation who prosecutors know is represented by counsel," and used scripted questions "designed to influence the target to waive attorney-client privilege."   *Id.* at 1213, 1245 (suppressing statements made during *ex parte* interviews because "[t]he prosecutors' and investigators' statutory violation of the no-contact rule and concurrent departure from internal policies of the DOJ, FBI and IRS that protect citizens' rights denied Defendant due process ...").   *Cf. Thomas*, 474 F.2d at 112 (finding

---

[7] It is well-settled that "'one under investigation . . . is legally entitled to insist upon the observance of rules' promulgated by an executive or legislative body for his protection." *Koerber*, 966 F. Supp.2d at 1234-35 (quoting *Bridges v. Wilson*, 326 U.S. 135, 153 (1945).   Established precedent says a violation of a these publicly known rules can itself constitute a denial of due process.   *See, e.g.*, *United States v. Leahey*, 434 F.2d 7 (1st Cir. 1970) (calling it a "general principle that due process requires government agencies to follow their specified procedures"); *United States v. Heffner*, 420 F.2d 809, 811 (4th Cir. 1969) ("An agency of the government must scrupulously observe rules, regulations, or procedures which it has established. When it fails to do so, its action cannot stand and courts will strike it down" (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)).   The Defendant refers the Court to *Koerber*, 966 F. Supp. 2d at 1235-41, for a thoughtful discussion of the cases leading to this conclusion.

suppression was an appropriate remedy for a violation of a no-contact rule).  *But see Hammad*, 858 F.2d at 841 (finding that the exclusionary rule applied to a violation of the no-contact rule that employed artfully contrived lawyer's devices, but declining to order suppression because the law was unsettled).  Here, no remedy short of suppression can deter the Government from future violations, meaningfully restore the rights that Dr. Sabean was entitled to invoke, and prevent the prejudice he would suffer in the absence of those rights..

## IV.  CONCLUSION

The ultimate decision lies in the Court's sound discretion:

> The decision as to the exclusionary implications of a violation of the procedure is ours, and based on our sense of the duties and rights so created. The crucial question is whether we must exclude this evidence so that agencies will be compelled to adhere to the standards of behavior that they have formally and purposefully adopted in the light of the requirements of the Constitution, even though these standards may go somewhat further than the Constitution requires.

*Leahey*, 434 F.2d at 10.  The very fact that the Government never informed Dr. Sabean and his practice manager that they had a right to an attorney before answering any questions is bad enough. The fact that the Government instructed Dr. Sabean's practice manager not to inform her employer of the Government's investigation, thereby preventing his attorney from properly responding to the Grand Jury Subpoena, is worse.   The fact that the Government instructed the practice manager to turn over materials that she asserted were privileged, particularly in light of the Government's own concerns about "privilege issues," is even more egregious.   However, that the Government still proceeded to interview Dr. Sabean without the knowledge or consent of his attorney on topics known to be privileged warrants exclusion, particularly in light of the Government's use of a carefully crafted waiver to invade a privilege between a target and his attorney concerning the very subject of the attorney's representation and the Government's investigation.   The no-contact rule and due process protections are designed to prevent that.

20

**WHEREFORE**, the Defendant respectfully requests that the Court suppress his statements to the Government on January 29, 2014.

Dated at Portland, Maine this 15th day of June, 2016.

/s/      <u>Jay P. McCloskey</u>
         Jay P. McCloskey

/s/      <u>Thimi R. Mina</u>
         Thimi R. Mina

/s/      <u>Alfred C. Frawley IV</u>
         Alfred C. Frawley IV

MCCLOSKEY, MINA & CUNNIFF, LLC
12 City Center
Portland, Maine 04101
(207) 772-6805
jmccloskey@lawmmc.com
tmina@lawmmc.com
afrawley@lawmmc.com

*Attorneys for Joel A. Sabean, M.D.*

21

# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | Docket No. 2:15-CR-175-GZS |
| | ) | |
| **JOEL A. SABEAN, M.D.** | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2016, I have electronically filed the foregoing **MOTION TO SUPPRESS STATEMENTS OF DEFENDANT** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

David B. Joyce
Donald E. Clark
James W. Chapman, Jr.
Assistant United States Attorneys
United States Attorneys' Office
100 Middle Street
Portland, Maine 04101
david.joyce@usdoj.gov
donald.clark@usdoj.gov
james.w.chapman@usdoj.gov

Dated this 15th day of June, 2016.

/s/    Alfred C. Frawley IV
Alfred C. Frawley IV

McCLOSKEY, MINA & CUNNIFF, LLC
12 City Center
Portland, Maine 04101
(207) 772-6805
afrawley@lawmmc.com

22