UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | Docket No. 2:15-CR-175-GZS |
| ) | |
| **JOEL A. SABEAN, M.D.** ) | |

**DEFENDANT'S TRIAL BRIEF**

**COMES NOW**, the Defendant, Joel A. Sabean, M.D. ("Dr. Sabean"), by and through his undersigned attorneys, and pursuant to the Court's November, 2016 Trial List and Local Rule 157.2, hereby submits the following trial brief.

**I.   STATEMENT OF THE GOVERNMENT'S CASE**

On October 20, 2015, a grand jury indicted Dr. Sabean on five counts of tax evasion (the "Tax Evasion Counts"), 52 counts of unlawful distribution of controlled substances, and a single count of health care fraud (together, the "Prescription Fraud Counts"). *See Indictment* (Docket No. 1). With respect to the Tax Evasion Counts, the Government alleges that Dr. Sabean deducted payments made to his adult daughter, Shannon Sabean, as medical expenses when he allegedly knew that Shannon was not sick and was using the money for other purposes. The Government does not contend that Dr. Sabean failed to report any income on his tax returns or that he used the medical deductions as a way to disguise the source of his income.

The Indictment also charges the Defendant with 52 counts of unlawful distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1), which provides that "[e]xcept as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense . . . a controlled substance." These counts relate to non-narcotic prescriptions allegedly written by Dr. Sabean to treat his adult daughter Shannon's

1

anxiety, depression and sleeplessness. The Government alleges that these prescriptions are unlawful because they occurred outside the usual course of professional practice and not for a legitimate medical purpose.

## II. LEGAL BASIS FOR ANTICIPATED DEFENSES

In addition to the specific jury instructions the Defendant has proposed with respect to the Government's allegations and his available defenses, the Defendant offers the following legal background on the charges.

### A. *Defenses to the Tax Evasion Counts.*

Pursuant to 26 U.S.C. § 7201, "[a]ny person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof." Tax evasion under 26 U.S.C. § 7201 is a specific intent crime. *See United States v. McGill*, 964 F.2d 222, 239 n. 1 (3rd Cir. 1992). Accordingly, the "willfulness" standard under 26 U.S.C. § 7201 requires proof of a "voluntary, intentional violation of a known legal duty." *United States v. Cheek*, 498 U.S. 192, 202 (1991) ((quoting *United States v. Bishop*, 412 U.S. 346 (1973) and *United States v. Pompino*, 429 U.S. 10 (1976)). In other words, the Government must prove that the Defendant had "a consciousness of wrongdoing." *United States v. St. Pierre*, 599 F.3d 19, 21 (1st Cir. 2010).

The Defendant contends that he had a subjective, good-faith belief that his daughter was using the funds he sent to her for medical treatment. A subjective good-faith belief that the tax provision in question did not impose a duty on the Defendant personally is enough to negate the required element of intent, regardless of whether that subjective belief is objectively reasonable. *Cheek*, 498 U.S. at 203. "In the end, the issue is whether, based on all the evidence, the

2

Government has proved that the defendant was aware of the duty at issue, which cannot be true if the jury credits a good-faith misunderstanding and belief submission, whether or not the claimed belief or misunderstanding is objectively reasonable." *Id.* at 202.

### A. *Defenses to the Prescription Fraud Counts.*

Section 841 of the Controlled Substances Act makes it "'unlawful for any person knowingly or intentionally ... to manufacture, distribute, or dispense ... a controlled substance' unless that person is a registered person acting pursuant to an effective prescription." *United States v. Smith*, 573 F.3d 639, 646 (8th Cir. 2009) (quoting 21 U.S.C. § 841(a)(1)). *See also* 21 U.S.C. § 822(b) (physician's exemption for registered "practitioners" who issue "effective" prescriptions). An "effective" or valid prescription is one that is "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). The Government has the burden of "proving that a practitioner's prescriptions were not issued for a legitimate medical purpose . . . in the usual course of . . . professional practice." *United States v. Hooker*, 541 F.2d 300, 305 (1st Cir. 1976) (internal quotation marks omitted) (quoting *United States v. Black*, 512 F.2d 864, 871 (9th Cir. 1975)).[1] Put another way, the Government must prove "beyond a reasonable doubt that the doctor was acting outside the bounds of professional medical practice, as his authority to prescribe controlled substances was being used not for treatment of a patient, but for the purpose of assisting another in

---

[1] For practical purposes, "there is no difference in the meanings of the statutory phrase, '[i]n the course of professional practice' and the regulations' phrase, 'legitimate medical purpose.'" *See, e.g.*, *United States v. Rottschaefer*, 178 Fed. Appx. 145, 147-48 (3rd Cir. 2006) (quoting *United States v. Kirk,* 584 F.2d 773, 784 (6th Cir. 1978)); *United States v. Rosenberg*, 515 F.2d 190, 196-97 (9th Cir. 1975) (same); *United States v. Nelson,* 383 F.3d 1227, 1231 (10th Cir. 2004) ("It is difficult to imagine circumstances in which a practitioner could have prescribed controlled substances within the usual course of medical practice but without a legitimate medical purpose. Similarly, it is difficult to imagine circumstances in which a practitioner could have prescribed controlled substances with a legitimate medical purpose and yet be outside the usual course of medical practice").

3

the maintenance of a drug habit or of dispensing controlled substances for other than a legitimate medical purpose, i.e. the personal profit of the physician." *United States v. Katz*, 445 F.3d 1023, 1028 (8th Cir. 2006) (internal quotation marks omitted); *United States v. Feingold*, 454 F.3d 1001, 1008 (9th Cir. 2006) ("To convict under § 841(a)(1), a "jury must make a finding of intent not merely with respect to distribution, but also with respect to the doctor's intent to act as a pusher rather than a medical professional"); *United States v. Moore*, 423 U.S. 122, 138 (1975)). [2]

Dr. Sabean contends that the prescriptions at issue were written in the usual course of medical practice for a legitimate medical purpose. Dr. Sabean also contends he issued these prescriptions in good faith. Under the "good faith" defense, a defendant cannot "be convicted if he merely made 'an honest effort' to prescribe ... in compliance with an accepted standard of medical practice." *Moore*, 423 U.S. at 142. *See also United States v. Vamos,* 797 F.2d 1146, 1151 (2d Cir.1986) ("[T]he doctor must act in the good faith belief that his distribution of the controlled substance is for a legitimate medical purpose and in accordance with the usual course of generally accepted medical practice."). In other words, "[i]f a physician dispenses a drug in good faith in the course of medically treating a patient, then the doctor has dispensed the drug for a legitimate medical purpose in the usual course of accepted medical practice." *United States v. Volkman,* 736 F.3d 1013, 1021 (6th Cir. 2013) (quotation marks omitted). The Defendant does not have to prove that he acted in good faith; "rather, the burden of proof is on the government to

---

[2] *See also United States v. Seelig,* 622 F.2d 207, 213 (6th Cir. 1980) ("[A] conviction under § 841(a)(1) requires the government to prove beyond a reasonable doubt that the drugs were distributed outside the usual course of professional practice")); *United States v. King*, 587 F.2d 956, 965 (9th Cir. 1978) ("United States v. Hooker, 541 F.2d 300 (1st Cir. 1976), reinforces our conclusion that the Government retains the task of proving that a practitioner's dispensations of controlled substances were not for legitimate medical purposes"); *United States v. Rogers*, 609 F.2d 834, 839 (5th Cir. 1980) (the Government must prove that a physician "distributed or dispensed controlled substances and that he acted knowingly and intentionally and that he did so other than for a legitimate medical purpose and the usual course of his professional practice"); *United States v. Varma,* 691 F.2d 460, 462 (10th Cir. 1982) (same).

4

prove . . . beyond a reasonable doubt that the defendant acted without a legitimate medical purpose outside the course of usual professional practice." *United States v. Volkman*, 797 F.3d 377, 387 (6th Cir. 2015); *United States v. Wexler*, 522 F.3d 194, 205 (2d Cir. 2008) ("A physician charged with the illegitimate distribution of controlled substances, and thus with deviating from the usual course of medical practice, may raise a good-faith defense to be disproved by the Government beyond a reasonable doubt"); *United States v. Maye*, No. 08-CR-194S, 2014 WL 1377225, at *2 (W.D.N.Y. Apr. 8, 2014) ("The Government has the burden of establishing the Defendant's lack of good faith beyond a reasonable doubt….")

### III.   CONTROVERTED POINTS OF LAW AND EVIDENTIARY ISSUES

In addition to the issues that have been raised by the parties though motions *in limine*, the Defendant notes the following legal and evidentiary issues that may arise at trial.

#### A.   *The Defendant's Objection to Joinder of the Tax Evasion and the Prescription Fraud Charges.*

On September 29, 2016, the Court denied the Defendant's Motion for Severance (Docket No. 25), finding that the tax evasion counts and the prescription fraud counts "relate to the same time period and involve similar issues," and that "the Government's proffered motive does link the tax counts with the other fraud counts." *See Order on Mot. to Sever* at 3 (Docket No. 62). "[A]n appropriate denial of a pretrial motion for severance does not preclude a later ruling that there should be a severance because of prejudice which develops at trial." *United States v. Sandini*, 888 F.2d 300, 309 (3d Cir. 1989). Accordingly, and for the reasons stated in the Defendant's Motion to Sever, the Defendant confirms and asserts again his objection to joinder because 1) the Government's basis for joinder is not apparent from the face of the Indictment; 2) the tax evasion charges did not arise directly from the prescription fraud charges; 3) a common motive alone is

5

insufficient to justify joinder; 4) the Government's proffered motive evidence should be excluded as irrelevant and unduly prejudicial; and 5) joinder results in unfair prejudice to the Defendant. *See generally Def's Mot. to Sever* (Docket No. 25); *Def.'s Mot. in Limine* (Docket No. 40).

Based on the expert testimony the Government intends to offer from Gary Hatfield, M.D., the Defendant also objects to joinder on the basis of testimonial prejudice, which arises from "a desire on the defendant's part to testify on one offense but not all offenses, where joinder would force the defendant 'to choose the unwanted alternative of testifying as to both or testifying as to neither.'" *United States v. Swan*, No. 1:12-CR-00027-JAW, 2012 WL 6193213, at *6 (D. Me. Dec. 12, 2012) (quoting *United States v. Scivola,* 766 F.2d 37, 41–42 (1st Cir. 1985)). For example, Dr. Hatfield proposes to testify that "knowledge and training are needed to give proper care, and thus a physician should not practice outside their fields of expertise." *Hatfield Report* at 5 (Docket No. 76-1). Dr. Sabean, however, cannot testify as to his knowledge and training concerning the treatment of sleep disorders anxiety disorders, anxiety caused by depression and anxiety and sleep disorders resulting from ADHD (knowledge and training he gained before he became a dermatologist) without subjecting himself to cross-examination on the tax evasion counts, including specifically whether he knew that the medical care Shannon purportedly received in Florida was "neither medically sensible nor legitimate." *Id.* at 26. Similarly, Dr. Sabean is unable to testify concerning his examinations of Shannon, his treatment plan and reasons for treating her in the manner he treated her, or any of his other objective assessments of Shannon's medical conditions without opening himself up to cross-examination on the tax evasion charges, including specifically his understanding of Shannon's purported illnesses that he did not treat. Accordingly, based on the testimony offered by the Government at trial, joinder will result in such

testimonial prejudice to the Defendant that severance is warranted.

### B.     *Admissibility of Mental Disease or Defect Evidence.*

Evidence of a mental disease or defect not amounting to insanity is relevant to negate specific intent. Pursuant to Fed. R. Crim. P. 12.2(b)(1), the Defendant has put the Government on notice that he intends to introduce expert testimony by Dr. Carlyle Voss that the Defendant suffers from a Personality Disorder (Other Specified, DSM-5, § 301.89) and aspects of delusional disorder, which causes a clinically significant impairment in his ability to critically assess and evaluate the behavior and statements of family members and to comprehend their experiences and motivations.

Expert evidence of a mental disease or defect is admissible to negate specific intent so long as the specific medical evidence 1) is relevant to whether the defendant had the requisite specific intent; 2) has probative value that is not substantially outweighed by confusion or delay; and 3) meets the *Daubert* standard of admissibility. *United States v. Schneider*, 111 F.3d 197, 201 (1st Cir. 1997) (internal citations omitted).[3] "Psychiatric evidence is admissible to negate *mens rea*

---

[3] Under Rule 704(b), expert testimony in this area is admissible if it "support[s] an inference or conclusion that the defendant did or did not have the requisite mens rea, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony." *United States v. Morales,* 108 F.3d 1031, 1038 (9th Cir. 1997). Accordingly, an expert may testify "as to whether a defendant was suffering from a severe mental disease or defect at the time of the offense and the characteristics of that diagnosis," *United States v. Ramirez*, 495 F. Supp. 2d 92, 121 (D. Me. 2007), and on the "'causation' factor, i.e. whether the mental state as the defendant describes it, if believed, can scientifically be attributed to the severe mental disease or defect." *United States v. Meader,* 914 F. Supp. 656, 659 (D. Me. 1996). As the Senate Judiciary Report on Rule 704(b) indicated:

> *Psychiatrists, of course, must be permitted to testify fully about the defendant's diagnosis, mental state and motivation (in clinical and commonsense terms) at the time of the alleged act so as to permit the jury or judge to reach the ultimate conclusion about which they and only they are expert....*

*United States v. DiDomenico*, 985 F.2d 1159, 1172 (2d Cir. 1993) (Ward, J. dissenting) (emphasis in *DiDomenico*) (quoting S. Rep. No. 225, 98 Cong., 2d Sess. 230-31 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3412-13).

when the evidence focuses on the defendant's specific state of mind at the time the offense was committed," as opposed to his capacity to form the requisite intent. *United States v. Westcott*, 83 F.3d 1354, 1358 (11th Cir. 1995). Under this framework, psychiatric evidence is admissible if it supports a "legally acceptable theory of lack of *mens rea*" and a "genuine link between the proffered expert testimony and the issue of intent." *United States v. Dupre*, 339 F. Supp. 2d 534, 541 (S.D.N.Y. 2004) (quoting *United States v. Cameron,* 907 F.2d 1051, 1067 (11th Cir. 1990)).

Because "courts have held that psychological testimony should be admitted where the crime involved a specific intent," and tax evasion is a specific intent crime, such testimony is admissible under Rules 401 and 702 if it relates to "a complaint, an affliction, or a psychological characteristic susceptible to clinical evaluation" that bears on a defendant's ability to form the specific intent needed to prove tax evasion. *See United States v. Masat*, 896 F.2d 88, 94 (8th Cir. 1990). In *United States v. Cohen*, for example, the defendant – an employee of a well-known tax recidivist and "consultant" – was charged with aiding and abetting the filing of false tax returns for helping his employer encourage clients to file "zero returns." 510 F.3d 1114, 1116 (9th Cir. 2007). The Defendant sought to introduce expert testimony that he had not intended to violate the law but had a narcissistic personality disorder that caused him to have "irrational beliefs" that what his employer was doing was lawful. *Id.* at 1123. Specifically, the Defendant tendered an expert report along the following lines:

> Because [the defendant's] beliefs are fixed and have led him to significant adverse consequences, he is irrational to the point of dysfunction, demonstrated by his stubborn adherence in the face of overwhelming contradictions and knowledge of substantial penalty. ... Despite evidence to the contrary, his psychological needs dominated his mentation.... This is the nature of the narcissistic personality in which the sufferer could essentially pass a lie detector test when asked commonsensical questions while giving improbable answers.

*Id*. The Ninth Circuit reversed the trial court's decision to exclude the expert, reasoning that the

8

testimony "would have bolstered the contention that [the defendant] had a good faith belief that he was acting in accordance with the law" because it revealed how the defendant's "tendency to cling doggedly to [his] beliefs even in the face of overwhelming contradictions" led him to believe his employer's assertions that one could legally submit a zero return. *Id.* at 1124. This testimony, the Court reasoned, "would have helped [the defendant] counter the government's suggestion that [the defendant] knew the zero returns were false" because, "[a]ccording to his expert's report, a narcissistic personality disorder like [the defendant's] can cause a person to continue to believe something to be true despite overwhelming evidence of its patent absurdity." *Id.* at 1124-25.[4]

Similarly, in *United States v. Finley,* 301 F.3d 1000 (9th Cir. 2002), the defendant sought funding to open a chain of bookstores from a supposed investment guru who claimed to have recorded liens against various banks which could be drawn upon by the issuance of certain negotiable instruments. *Id.* at 1002-03. The investment guru gave the defendant several of these

---

[4] *See also United States v. Madoch*, 935 F. Supp. 965, 970 (N.D. Ill. 1996) (allowing expert testimony that "Defendant was suffering from a mental disorder at the time of the alleged offenses [of income tax evasion]. In addition, the Court finds that specialized knowledge of the disorders defined in DSM–IV would be helpful to the jury" because "the expert can coherently present to the jury his or her observations of the defendant, as well as his or her understanding of the defendant's mental history, and explain to the jury how those observations and that history are relevant to the defendant's mental condition" (quoting *United States v. Fazzini,* 871 F.2d 635, 635 (7th Cir. 1989))). In *Madoch*, the defendant proffered expert testimony along the following lines:

> [Defendant's] life long history of sexual, physical and emotional abuse which began in her early childhood and continued throughout her adult life fostered a severe personality disorder which is characterized by intense dependent traits and avoidant traits. It was due to her personality disorder compounded by her chronic depressive disorder that [Defendant] was unable to form the expected curiosity and questions which one would otherwise expect. Given her exorbitant need for affection, her need to please others, her low self esteem, and her desire to placate those who stimulate unbearable feelings, along with her inability to recognize her capabilities or intellect, she is likely to comply with the directions of another and may proceed to do as asked with very little curiosity or questioning unless it is recognizably illegal to her. She is also slow to realize the wrongdoing or motivations of others thereby placing herself in compromising predicaments which are hazardous to her.

*Madoch*, 935 F. Supp. at 969.

9

bogus instruments, claiming that they were worth nearly seven million dollars, and the defendant persisted in attempting to pay off his tax debt with these instruments even after banking institutions and the IRS refused to honor them. *Id.* at 1003-04. Although the trial court excluded the defendant's proffered expert testimony that he had a "delusional disorder in which ... information from the real world ... is so grossly distorted that the person ends up with" bizarre, irrational and fixed beliefs, the Ninth Circuit reversed because:

> Jurors are unlikely to know that psychologists have identified a personality disorder that explains why a seemingly normal person could reject or distort certain overwhelmingly true information. [The expert's] testimony would have offered an explanation as to how an otherwise normal man could believe that these financial instruments were valid and reject all evidence to the contrary. While [the defendant] could and did testify about how and why he believed the instruments were valid, only a trained mental health expert could provide a counterweight to the government's allegations against [the defendant]. On the basis of the record before us, [the defendant] was entitled to present [the expert's] testimony to support his defense theory.

*Id.* at 1013 (citing *United States v. Shay*, 57 F.3d 126, 133 (1st Cir. 1995)).

*Cohen* and *Finley* relied on the same factors, factors that are present in this case. First, a third party convinced the defendants in *Cohen* and *Finley* that they could legally engage in the transactions at issue. *See Cohen*, 510 F.3d at 1124. In this case, the Defendant contends that Shannon convinced Dr. Sabean that her medical expenses were legitimate. Second, the expert testimony suggested in *Cohen* and *Finley* suggested that the defendant "had a tendency to cling doggedly to their beliefs even in the face of overwhelming contradictions." *Id.* In this case, Dr. Voss is expected to testify that Dr. Sabean's personality disorder significantly impaired his ability to test reality in the context of his daughter's claims of unusual and serious illnesses and his actions with respect to those claims and her pleas for financial assistance, as well as his ability to critically assess and evaluate the behavior and statements of family members and to comprehend their experiences and motivations. Third, the proffered testimony countered the Government's

10

allegations that the defendants knew that the transactions they engaged in were illegal. *Id.* In this case, Dr. Voss's testimony will counter the Government's argument that Dr. Sabean knew that the money he gave to Shannon could not lawfully be deducted as a "medical expense" on his tax returns. Dr. Voss's testimony will also rebut the Government's contention that Dr. Sabean sent money to his daughter to induce her to keep quiet about her allegations of abuse.

### C.   *Evidence of Shannon Sabean's Statements About Her Family, Financial, Personal and Medical History*

The Defendant intends to introduce evidence that Shannon Sabean regularly lied concerning her family, financial, personal and medical history. Cross-examiners may delve into collateral matters where they are likely to assist the jury in weighing a witness's credibility. *See United States v. Nogueira*, 585 F.2d 23, 25 (1st Cir. 1978); *United States v. Lara*, 181 F.3d 183, 199 (1st Cir. 1999) ("It is equally standard—and equally proper—for a cross-examiner to delve into matters which, although not mentioned on direct examination, bear on the witness's credibility" (citing *McGautha v. California,* 402 U.S. 183, 215 (1971)). Moreover, "the absolute prohibition on extrinsic evidence applies only when the *sole* reason for proffering that evidence is to attack or support the witness' character for truthfulness." *United States v. Epstein*, 426 F.3d 431, 439 (1st Cir. 2005) (emphasis in original); *United States v. Beauchamp*, 986 F.2d 1, 3-4 (1st Cir. 1993) ("extrinsic evidence to disprove a fact testified to by a witness is admissible when it satisfies the Rule 403 balancing test and is not barred by any other rule of evidence").

In addition to attacking her overall credibility as a witness, extrinsic evidence of Shannon's various statements about these topics is admissible to 1) show her common scheme of lying about her family, financial, personal and medical history in order defraud others, including her family; 2) demonstrate her self-interest and motivation to lie about her family, personal and medical history

in order to exculpate herself from wrongdoing and/or to benefit financially; 3) cast doubt on her allegations of familial abuse; 4) establish the context of her relationship with key witnesses and demonstrate how she co-opted others into assisting her in defrauding her father; 5) reveal her opportunity and ability to use special skills, equipment and tactics to defraud others; 6) explain her medical and psychiatric history as it relates to her motive to lie; and 7) establish her bias.   Finally, "[e]xposing a witness's motive to lie is a 'core value' of the Sixth Amendment's Confrontation Clause," and "a party may introduce extrinsic evidence to show it."  *United States v. Salem*, 578 F.3d 682, 686 (7th Cir. 2009).[5]

### D.     *The Parties' Opening Statements.*

The Defendant previously moved for an Order establishing certain procedures to keep the jury from hearing evidence of Shannon's allegations until a final ruling on their admissibility. *See Def.'s Mot. Regarding the Reception of Evidence* (Docket No. 70).   The Court has denied this Motion. Due to the likelihood that the Government will mention Shannon's allegations during its opening statement over the Defendant's well-documented objected, the Court must either allow the Defendant to mention evidence negating the *mens rea* required in this case, as evidence of the Defendant's mental defect goes to the exact same issue as Shannon's allegations – the Defendant's state of mind at the time of the offense – or preclude the Government from mentioning Shannon's allegations in its opening.   It would be unfair for the Government to refer to Shannon's allegations in its opening while precluding the Defendant from making any reference to his rebuttal in his

---

[5] *See also Beauchamp*, 986 F.2d at 4 ("[A] witness's self-interest or motive to testify falsely is generally considered to be a non-collateral issue"); *United States v. Rios Ruiz*, 579 F.2d 670, 673 (1st Cir. 1978) ("[E]vidence showing the "emotional partiality" of a witness "is always significant in assessing credibility," for "the trier must be sufficiently informed of the underlying relationships, circumstances and influences operating on the witness so that, in light of his experience, he can determine whether a mutation in testimony could reasonably be expected as a probable human reaction. Courts are therefore very liberal in accepting testimony relevant to a showing of bias" (quoting 3 Weinstein's Evidence § 607(03), p. 1079)).

opening, particularly given that 1) the Defendant's expert evidence of his mental statement is corroborated by multiple doctors and psychologists; 2) the Defendant's diagnoses pre-date even the 1997 case; 3) there is record evidence establishing these diagnoses beyond Dr. Voss's expert opinion; 4) one of the Government's own experts, Dr. Hatfield, has raised the possibility that Dr. Sabean was extremely confused; 5) the Defendant's proffered evidence is far more reliable then the Government's motive evidence; 6) case law, described above, has found that these precise disorders can negate the very *mens rea* required of these same charges; and 7) the Government has not made an offer of proof with respect to Shannon's story.  The Defendant objects to the introduction of any testimony relating to these allegations and intends to make general and specific objections to Shannon's testimony at trial.   It would be unfair to permit the Government to refer to Shannon's allegations in its opening while precluding the Defendant from making any reference to his rebuttal.

### *E.     The Government's Potential Use of Perjured Testimony.*

The Government is being permitted, over defense objection, to offer the testimony of a known perjurer and pathological liar.  During Shannon Sabean's testimony, the parties and the Court must be cognizant that "[a] conviction obtained by the knowing use of false or perjured testimony 'is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'"  *United States v. Kattar*, 840 F.2d 118, 127 (1st Cir. 1988) (quoting *United States v. Agurs,* 427 U.S. 97, 103 (1976)).  "It is immaterial that the particular prosecutor in this case may not have known about the evidence that revealed [the witness's] testimony as possibly false. The Justice Department's various offices ordinarily should be treated as an entity, the left hand of which is presumed to know what the right

hand is doing." *Id.* (citing *Giglio v. United States,* 405 U.S. 150, 154 (1972)). Importantly, "[t]he function of the United States Attorney's Office . . . is not merely to prosecute crimes, but also to make certain that the truth is honored to the fullest extent possible during the course of the criminal prosecution and trial. If it happens that the government's original perspective on the events in question is proven inaccurate, such revelation is in the government's interest as well as the defendant's. The criminal trial should be viewed not as an adversarial sporting contest, but as a quest for truth." *Id.* The defense has given ample notice of the grave risk of unfair prejudice and devastating reputational injuries that could follow from its use of Shannon Sabean's testimony. Suffice it to say that the Government has an obligation not to knowingly present testimony that it knows is false and to immediately correct any false testimony that it did not anticipate. Given Ms. Sabean's history, issues concerning these obligations may well arise.

Dated at Portland, Maine this 24th day of October, 2016.

/s/ Jay P. McCloskey
Jay P. McCloskey

/s/ Thimi R. Mina
Thimi R. Mina

/s/ Alfred C. Frawley IV
Alfred C. Frawley IV

MCCLOSKEY, MINA & CUNNIFF, LLC
12 City Center
Portland, Maine 04101
(207) 772-6805
jmccloskey@lawmmc.com
tmina@lawmmc.com
afrawley@lawmmc.com

*Attorneys for Joel A. Sabean, M.D.*

14

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | ) Docket No. 2:15-CR-175-GZS |
| | ) |
| **JOEL A. SABEAN, M.D.** | ) |
| | ) |

**CERTIFICATE OF SERVICE**

    I hereby certify that on October 24, 2016, I have electronically filed the foregoing **DEFENDANT'S TRIAL BRIEF** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

David B. Joyce
Donald E. Clark
James W. Chapman, Jr.
Julia M. Lipez
Assistant United States Attorneys
United States Attorneys' Office
100 Middle Street
Portland, Maine 04101
david.joyce@usdoj.gov
donald.clark@usdoj.gov
james.w.chapman@usdoj.gov
julia.lipez@usdoj.gov

Dated this 24th day of October, 2016.

/s/    Alfred C. Frawley IV
          Alfred C. Frawley IV

          McCloskey, Mina & Cunniff, LLC
          12 City Center
          Portland, Maine 04101
          (207) 772-6805
          afrawley@lawmmc.com