UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

------------------------------

UNITED STATES OF AMERICA,              CRIMINAL ACTION

              Plaintiff           Docket No: 2:15-cr-175-GZS


      -versus-                         **E X C E R P T**

                                   **Dezzerra Tsai**

JOEL A. SABEAN, MD,

          Defendant
------------------------------

Transcript of Proceedings


Pursuant to notice, the above-entitled matter came on
for **Trial** held before **THE HONORABLE GEORGE Z. SINGAL,**
United States District Court Judge, in the United
States District Court, Edward T. Gignoux Courthouse,
156 Federal Street, Portland, Maine on the 8th day of
November, 2016 at 1:00 p.m. as follows:


Appearances:

For the Government:  David B. Joyce, Esquire

                     James W. Chapman, Jr., Esquire
                     Assistant United States Attorneys

For the Defendant:  Alfred C. Frawley, IV, Esquire
                    Jay P. McCloskey, Esquire
                    Thimi E. Mina, Esquire


                    Dennis R. Ford
                 Official Court Reporter

              (Prepared from manual stenography
               and computer aided transcription)

Tsai-Direct/McCloskey

```
 1              (The following is an excerpt.)
 2              (Open court.  Defendant present).
 3              MR. MCCLOSKEY:  Yes.  Dezzerra Tsai.
 4              THE COURT:  Right up there.
 5              THE CLERK:  Please raise your right hand.  Do
 6     you solemnly swear that the testimony you will give in
 7     the cause now in hearing will be the truth, the whole
 8     truth, and nothing but the truth, so help you God?
 9              THE WITNESS:  I do.
10              THE CLERK:  Thank you.  Please be seated.
11     Please pull right up to the microphone.  State your
12     name and spell your first and last name for the record.
13              THE WITNESS:  Dezzerra Tsai.  It's
14     D-E-Z-Z-E-R-R-A.  Last name is T-S-A-I.
15                     DIRECT EXAMINATION
16     BY MR. MCCLOSKEY:
17     Q.    Dezzerra, where do you live?
18     A.    West Palm Beach Florida.
19     Q.    And are you married?
20     A.    I am.
21     Q.    What's your husband's name?
22     A.    John Tsai.
23     Q.    Are you employed?
24     A.    I'm a nursing student.
25     Q.    And how far have you gone in nursing school?
```

Tsai-Direct/McCloskey

1   A.    I'm about five weeks from graduation.

2   Q.    And do you know Shannon Sabean?

3   A.    I do.

4   Q.    And can you tell us when you met her.

5   A.    I met her in 2008, 2009.  Late 2008, 2009.

6   Q.    And how did you meet her?

7   A.    I met her through a mutual friends of ours.

8   Q.    And after you -- what was the occasion that you

9   met her?

10  A.    We met her at her house, her apartment in Boca

11  Raton.

12  Q.    And who else was there?

13  A.    My husband was there.

14  Q.    And who -- after you met her for the first time,

15  how often were you with her after that?

16  A.    A lot.  We became very close friends.  She

17  actually -- I would see her probably 3 or 4 times a

18  week.

19  Q.    And what did Shannon tell you when you first met

20  her about her background?

21  A.    She told us that her family owned a publishing

22  company.

23        MR. CHAPMAN:  Objection, Your Honor.  This is

24  hearsay.

25        THE COURT:  I'm sorry, let me see counsel.

Tsai-Direct/McCloskey

1          (Sidebar conference).

2          MR. CHAPMAN:  This is all hearsay, Judge, what

3     Shannon told this witness.

4          MR. MCCLOSKEY:  Judge, I'm offering this on a

5     variety of reasons.  One is to establish the

6     relationship with this woman, with her method of

7     operation, Shannon's method of operation, the ability

8     to convince people of various things like she said she

9     read -- she has a publishing business.

10         THE COURT:  Shh-shh.

11         MR. MCCLOSKEY:  I want to show the

12    relationship with this woman was deep and close.  It

13    puts the whole context of her relationship with

14    Shannon --

15         THE COURT:  Which of those is a hearsay

16    exception?

17         MR. MCCLOSKEY:  Well, we're not offering this

18    for the truth so there's not hearsay.  It's not

19    hearsay.  If it's not offered for the truth, it's not

20    hearsay, correct?

21         THE COURT:  What's it offered for again?  Give

22    me those reasons you've told me.

23         MR. MCCLOSKEY:  It's to show again her

24    relationship with this woman, the fact that she -- her

25    method of operation, her habit under 406 to lie to

Tsai-Direct/McCloskey

1    people and to tell them about various things and her

2    background.  I offer it under 404(b) to show motive,

3    absence of mistake, accident, common scheme, knowledge

4    or intent.  It will show that over the course --

5              THE COURT:  That's a lot of baggage for one

6    question.

7              MR. MCCLOSKEY:  Well, it is not baggage.  It's

8    very relevant to this woman's relationship with Shannon

9    and what Shannon did with her, what she told her, what

10   happened thereafter, so it provides context.

11        Without sort of the context, you don't get any

12   sort of idea what Shannon --

13             THE COURT:  What's she going to say about this

14   publishing company?

15             MR. MCCLOSKEY:  She's going to say that's what

16   she told her.  Ultimately, she determined that it

17   wasn't true.  She told her that she got money from a

18   trust fund from her father or her grandfather.  She's

19   going to say that she had been offered -- offered her

20   husband employment, which they, in fact, thought was

21   true.  They went and looked at various apartments that

22   turned out not to be true.

23        She then had a breakup with this person, with

24   Dezzerra and her family.  She then came back and

25   developed a further relationship and had various

Tsai-Direct/McCloskey

1    conversations really about the taxes and so forth that

2    Shannon was telling the Court -- or the sickness that

3    Shannon was telling her father she had and the

4    connection to the taxes.

5        So there's a lot of context here that's important

6    for background to establish the statements that Shannon

7    made to this woman about what Dr. Sabean knew and

8    didn't know and what he was doing.

9        MR. CHAPMAN:  Judge, what I remember Shannon

10   being asked when she was on the stand was just a very

11   few questions about this witness.  I believe she was

12   asked if she knew her and was she friends with her and

13   did she try to call her or text her from jail after she

14   was jailed for the community service violation.

15       I don't think she was asked about any of that

16   stuff where she could have either admitted it if she

17   had the chance or denied it, which would be a predicate

18   for, you know, impeaching her by contradiction, but

19   this is all hearsay, Judge, and 404(b) is no basis to

20   impeach this witness.

21       MR. MCCLOSKEY:  This is not used for an

22   impeachment of Shannon particularly.  What we will get

23   to is a confession that Shannon makes about the sexual

24   abuse, about the fact that her father didn't know that

25   her sickness is --

Tsai-Direct/McCloskey

1    THE COURT:  I'll deal with those questions
2 when they come.
3    MR. MCCLOSKEY:  But unless you get context of
4 what the relationship to this woman would be with
5 Shannon, you won't get that understanding of what --
6 how this developed so it places this whole thing in
7 context.
8    It's not hearsay because it's not true.  There are
9 sort of preliminary questions that happened with the
10 relationship with this woman.
11    MR. CHAPMAN:  If he wants to lay the
12 foundation to ask her opinion evidence of, you know,
13 her currently -- her ability for reputation in the
14 community or opinion about her truthfulness currently,
15 he can lay that foundation, but I think all the rest of
16 this is hearsay.
17    THE COURT:  Okay, I'll rule.
18    (Open court)
19    THE COURT:  Objection sustained.
20 BY MR. MCCLOSKEY:
21 Q.   Did there come a time when Shannon offered your
22 husband employment?
23 A.   She did.
24 Q.   And would you tell us about that, please.
25 A.   My husband has a law degree from Pittsburgh and

Tsai-Direct/McCloskey

```
1   Carnegia Mellon MBA so she offered him a position in
2   her family's publishing company.
3   Q.    And tell me what happened with that; how did that
4   develop?
5   A.    As -- she developed -- she offered him a position
6   as a legal consultant and had to draw up -- she had to
7   talk to --
8            MR. CHAPMAN:  Objection, Your Honor, same
9   basis.
10           THE COURT:  Sustained.
11  BY MR. MCCLOSKEY:
12  Q.    So after you had that conversation with her, did
13  you have occasion to actually go with her to where she
14  lived?
15  A.    We did.  Um --
16           THE COURT:  Wait for another question.  Go
17  ahead.
18  BY MR. MCCLOSKEY:
19  Q.    Did you have occasion to go where Shannon was
20  living?
21           THE COURT:  She said yes.
22  Q.    And did you have some occasion to look at some
23  units there?
24  A.    We did.
25  Q.    And why did you do that?
```

Tsai-Direct/McCloskey

1   A.     Shannon promised us --

2              MR. CHAPMAN:  Objection.  This is hearsay,

3   Judge.

4              THE COURT:  The question is why did you go to

5   the unit and -- wait a second, just a second -- and the

6   question therefore is it's not hearsay, it shows why

7   she did something.

8              MR. CHAPMAN:  Very well, Judge.

9              THE COURT:  The question -- the objection is

10  overruled.  Ladies and gentlemen of the jury, this is

11  not to be taken for any truth.  It's just to show why

12  she did something.  That's all.  You may proceed.

13  BY MR. MCCLOSKEY:

14  Q.     And so what did you do, Dezzerra?

15  A.     We went to look at several units with the

16  property manager until -- with Shannon because Shannon

17  said that her father rented apartments -- and would

18  rent them, one for us as part of our package working

19  with her company.

20  Q.     And who did you understand owned these condo

21  units?

22  A.     Dr. Sabean and his company.

23  Q.     And did you find out whether that was true or not

24  at the time --

25             MR. CHAPMAN:  Objection.

1        THE COURT:  That's sustained.

2   BY MR. MCCLOSKEY:

3   Q.    And what happened with you -- with you and your

4   husband; did you eventually move into one of those

5   units?

6   A.    No.

7   Q.    Why not?

8   A.    Because there were no units that were owned by

9   Dr. Sabean.

10  Q.    And then what happened with respect to your

11  housing?

12  A.    We rented a house with the assumption -- which

13  was a written document by Shannon --

14        MR. CHAPMAN:  Objection, Your Honor.

15        THE COURT:  Sustained.

16  BY MR. MCCLOSKEY:

17  Q.    So you went to look at another house?

18  A.    I did.

19  Q.    And who went with you?

20  A.    Shannon and my husband.

21  Q.    And did you end up renting that?

22  A.    We did.

23  Q.    And where did you get the money for doing that?

24  A.    I borrowed the money from my in-laws, about

25  $8,000.

Tsai-Direct/McCloskey

```
1    Q.    And was that based on any promise that Shannon

2    had made to you?

3            MR. CHAPMAN:  Objection.

4            MR. MCCLOSKEY:  I'm asking her --

5            THE COURT:  Let me see counsel.

6            (Sidebar conference).

7            THE COURT:  How is this not all 608 stuff?

8            MR. MCCLOSKEY:  Because I think it will

9    establish after she -- this happens, there's a break

10   with Shannon's relationship.  She then, about a year

11   later, gets connected to Shannon.  Shannon then asked

12   her various things or tells her various things about

13   her relationship with her father, so it sort of

14   explains why there was a break in the relationship.

15           THE COURT:  Why is that relevant that there

16   was a break in their relationship?

17           MR. MCCLOSKEY:  Well, because she had a

18   conversation when Shannon got back together with her

19   about --

20           THE COURT:  About -- why is it relevant to get

21   a break for them to talk?

22           MR. MCCLOSKEY:  Well, because I think it shows

23   the sort of seriousness that this woman questioned

24   Shannon -- I mean questioned Shannon about.  Without

25   that relationship -- without that break in the
```

Tsai-Direct/McCloskey

1    relationship, it sort of doesn't put it in context of

2    why she gets back together with her, why she confronts

3    her about lying, what Shannon says in relation to that

4    question and I think that is the reason that this kind

5    of evidence should come in.

6         It provides context for what this woman did and

7    what the relationship she had with Shannon, what she

8    asked Shannon and what Shannon said to her.  Without

9    that break, there's no sort of context to the

10   relationship.

11             THE COURT:  All right.

12             MR. CHAPMAN:  The context is the evidence of

13   specific instances of bad conduct and it shouldn't come

14   in under 608.

15             MR. MCCLOSKEY:  It's not bad conduct.  We're

16   not bringing it --

17             THE COURT:  It's bad conduct.

18             MR. MCCLOSKEY:  Okay, but we're not bringing

19   it in under that basis.  We're bringing it in to show

20   context of how it -- developed the relationship --

21             THE COURT:  I understand.  It is 806 -- 608(b)

22   stuff.  It's also 403 opening up all of these things.

23             (Open court).

24   BY MR. MCCLOSKEY:

25   Q.    So did you end up renting that house?

Tsai-Direct/McCloskey

```
1    A.    Yes.

2    Q.    And how long did you live there?

3    A.    Three months.

4    Q.    And what happened after three months?

5    A.    We were evicted.

6    Q.    Why were you evicted?

7    A.    For failure to pay rent.

8    Q.    Okay.  Thereafter, after that period of time,

9    what timeframe was that; if you remember?

10   A.    That was in 2009.

11   Q.    And did you thereafter see Shannon?

12   A.    No.  I stopped talking to Shannon.

13   Q.    Why was that?

14         MR. CHAPMAN:  I'm going to object, Your Honor.

15         THE COURT:  Sustained.  Move on.

16   BY MR. MCCLOSKEY:

17   Q.    Well, subsequent time after that period in time

18   that you stopped talking to Shannon, do you then

19   reconnect with Shannon at some point in time?

20   A.    I did.

21   Q.    And how long ago --

22         THE COURT:  Just slow down for the court

23   reporter if you would, Mr. McCloskey.

24   BY MR. MCCLOSKEY:

25   Q.    What was the time break between the time --
```

Tsai-Direct/McCloskey

1    A.     It was about a year.

2    Q.     And then what happened in terms of getting back

3    together with Shannon.

4    A.     We started talking to Shannon again because we

5    were friends with her boyfriend Josh and she said that

6    she was sorry and apologized for lying to me.

7           MR. CHAPMAN:  Objection, move to strike.

8           THE COURT:  Sustained.

9    BY MR. MCCLOSKEY:

10   Q.   Did you have some conversation --

11          THE COURT:  Wait.

12          MR. MCCLOSKEY:  Sorry.

13          THE COURT:  Jury will disregard.  Ask another

14   question.

15   BY MR. MCCLOSKEY:

16   Q.     Did you have some conversation with Shannon when

17   you reconnected with her?

18   A.     I did.

19   Q.     And what was that conversation about?

20   A.     It was about her promises to us --

21          MR. CHAPMAN:  Objection, Your Honor.  I don't

22   understand that --

23          THE COURT:  Does this have to do with the

24   issues I've already ruled on?

25          MR. MCCLOSKEY:  Well, yes and no, Your Honor.

Tsai-Direct/McCloskey

1           THE COURT:  Let me see you.

2           (Sidebar conference).

3           THE COURT:  What do you expect her to say?

4           MR. MCCLOSKEY:  She will say that Shannon

5    admitted to having a problem lying, that she said she

6    had been sexually and physically abused by her father

7    during her early teenage years and this caused her to

8    cut her arms.

9        Shannon said when she was a child, both her mother

10   and father used to put her in a room and used to beat

11   her.  She took that back and said no, it was more

12   emotional, it wasn't physical.  Shannon then said she

13   was emotionally disturbed.

14          THE COURT:  Do you object to that?

15          MR. CHAPMAN:  I don't object to the sexual

16   abuse admission, but, you know, everything else is

17   608(b).

18          THE COURT:  Well, I think that testimony is --

19   goes to impeachment.

20          MR. MCCLOSKEY:  Right.

21          THE COURT:  And I'm going to allow it.  Let's

22   focus on not publishing companies and ownership of

23   condo units.  Get to the meat of it.

24          MR. MCCLOSKEY:  This is it.

25          THE COURT:  Good, go ahead.

Tsai-Direct/McCloskey

```
 1              (Open court).
 2    BY MR. MCCLOSKEY:
 3    Q.    When you reconnected with Shannon, would you tell
 4    us about that conversation --
 5              THE COURT:  No, let's focus on specifics here.
 6    I don't know what this witness is going to say.
 7    BY MR. MCCLOSKEY:
 8    Q.    Did you have a conversation with Shannon when you
 9    reconnected to her?
10    A.    Yes.
11    Q.    What did she tell you?
12              THE COURT:  That's exactly the same question I
13    asked you to focus on a specific answer.
14              MR. CHAPMAN:  I don't object if he leads at
15    this point.
16              THE COURT:  That's what I'm trying to get
17    you -- to lead a little bit.
18    BY MR. MCCLOSKEY:
19    Q.    Did she tell you about her problem with lying?
20    A.    She did.
21    Q.    What did she say?
22    A.    She said that she had a problem with telling the
23    truth a lot to try and keep friends, to make friends,
24    that because her father had molested her when she was a
25    child and had beat her and locked her in a closet --
```

Tsai-Direct/McCloskey

1   her and her mother both and that she had some emotional

2   scaring.  She later changed that story.

3   Q.    What did she say when she changed it?

4   A.    That it was more emotional abuse, not physical.

5   This is the same conversation.

6   Q.    This is in the same conversation?

7   A.    Yes.  Yes, sir.

8   Q.    And after that, did you have occasion to be with

9   her when Shannon talked to her father on the phone?

10  A.    I did.

11          THE COURT:  Can you give me a context in terms

12  of date?

13  BY MR. MCCLOSKEY:

14  Q.    Could you give us a date on that, Dezzerra,

15  approximately?

16  A.    Which one?  Which one?

17  Q.    The conversation in which Shannon admitted to

18  being a liar.

19          THE COURT:  No, no, the date on the

20  conversation with the father.

21  BY MR. MCCLOSKEY:

22  Q.    The date of the conversation with the father.

23  A.    There were several dates.  It was all through

24  2009, and '10.

25  Q.    And did you have an opportunity to be part of

Tsai-Direct/McCloskey

 1    those conversations?

 2    A.    Yes.

 3    Q.    And how did that occur?

 4    A.    At one point, Shannon grabbed my arm and put me

 5    on the phone with Dr. Sabean, instructed me to tell him

 6    that I loved him, that it was a practical joke that she

 7    was playing with her father and that it would be funny

 8    and he knew about -- that it was a joke.

 9    Q.    And were you pretending to be somebody else?

10    A.    I was.

11    Q.    And who was that?

12    A.    Nurse Mary.

13    Q.    And did you have some conversation with Shannon

14    thereafter?

15    A.    I did.

16    Q.    What did you tell her?

17    A.    I handed the phone right back to Shannon and told

18    her I found it very disre -- disconcerting and

19    uncomfortable to pretend to tease her father about some

20    woman.

21    Q.    And did you have some conversation with Shannon

22    thereafter about other people pretending to be Nurse

23    Mary?

24    A.    I did.  She --

25          MR. CHAPMAN:  Objection, Your Honor, at this

Tsai-Direct/McCloskey

1    point.

2              THE COURT:  Basis?

3              MR. CHAPMAN:  At this point, it's getting into

4    hearsay being offered for the truth.

5              THE COURT:  I think it goes to credibility.

6    Not for the truth, but to credibility.  You can

7    proceed.

8    BY MR. MCCLOSKEY:

9    Q.   What did she tell you about other people being

10   Nurse Mary?

11   A.   She told us that there was a lady in her

12   apartment complex that pretended to be her all the time

13   on the phone with her father.  It was no big deal.

14   Q.   And what do you know about, if anything, about

15   Shannon using e-mail or texting to be Nurse Mary?

16   A.   She said that she frequently texted or e-mailed

17   her father or texted him pretending to be Nurse Mary

18   from a different phone number.

19   Q.   And do you have any information about whether Dr.

20   Sabean knew that Nurse Mary was really Shannon?  Do you

21   have any information?

22             THE COURT:  Sustained.

23   BY MR. MCCLOSKEY:

24   Q.   Now, at some point in time, did Shannon move in

25   with you and your husband?

Tsai-Direct/McCloskey

1    A.    He did.  She did.

2    Q.    When was that?

3    A.    That was in 2014.

4    Q.    And what was the reason for that?

5    A.    Shannon had stated that she had breast cancer and

6    she had been evicted from her apartment for not paying

7    the rent because her father had cut her off

8    financially.

9    Q.    And did you have any -- did you have occasion to

10   determine ultimately whether she did, in fact, have

11   breast cancer?

12   A.    She did not.

13   Q.    Now, directing your attention to 2014 during that

14   time period, did you have occasion to receive a call

15   from Shannon about needing a lawyer?

16   A.    I did.

17   Q.    And tell us about that.

18          MR. CHAPMAN:  Objection, hearsay.

19          THE COURT:  Let me see counsel.

20          (Sidebar conference).

21          THE COURT:  What am I going to hear?

22          MR. MCCLOSKEY:  Well, you're going to hear

23   that Shannon called her, said she needed a lawyer,

24   wanted Dezzerra to help her find a lawyer.  Shannon

25   said her father was being investigated for tax evasion

Tsai-Direct/McCloskey

1    and she, Shannon, was being investigated as a

2    co-conspirator.

3        She said Dr. Sabean was writing up medical bills

4    for his taxes.  She questioned her closely.  Shannon

5    said he didn't know, but he should have known.  If he

6    really believed me, he should have come to Florida.

7            THE COURT:  You're going to have to slow down,

8    Mr. McCloskey.

9            MR. MCCLOSKEY:  I'm sorry.

10           THE COURT:  The court reporter is having a

11   hard time.  Slow down a little bit.

12           MR. MCCLOSKEY:  I don't want to be as fast as

13   Mr. Frawley.

14           THE COURT:  I think you're challenging him.

15           MR. MCCLOSKEY:  Okay.  So Shannon said she was

16   being investigated for tax evasion and that she was

17   being investigated as a co-conspirator.  Dr. Sabean had

18   been writing up --

19           THE COURT:  He's not getting this.  If he's

20   not getting it, it's not -- it didn't happen.  Let's

21   start again.  She made a call -- Shannon called this

22   witness.

23           MR. MCCLOSKEY:  Said she wanted help with a

24   lawyer.

25           THE COURT:  Okay.  Now, just why isn't that

1    hearsay?

2           MR. MCCLOSKEY:  Because it will show what

3    Shannon thereafter told her about the illnesses that

4    she told Dr. Sabean that she had, that they weren't

5    true, but that he should have known because if they

6    were fake -- if he thought they were real, he would

7    have come to Florida, but he didn't.

8           (Discussion off the record between defense

9    counsel.)

10       Right, so it goes to Shannon's state of mind for

11   telling Dezzerra --

12          THE COURT:  She wanted a lawyer is a state of

13   mind?

14          MR. MCCLOSKEY:  No.  She wanted a lawyer to

15   help -- the IRS had been calling her, but then she

16   essentially tells Dezzerra that her father didn't know

17   that the medical expenses were false.  She questioned

18   her --

19          THE COURT:  Okay.  First part about the lawyer

20   and the IRS's investigator is out.  Then the next part

21   is she said that her father didn't know that --

22          MR. MCCLOSKEY:  That Shannon's illnesses were

23   fake.

24          THE COURT:  Go ahead.

25          MR. MCCLOSKEY:  And if he had known they were

1    fake, they were -- he thought they were real, he would

2    have come to Florida.  Since he didn't, he must have

3    known they were fake.

4            THE COURT:  Okay.  Now, I'm getting two things

5    here.  You're saying she said that the father knew that

6    the illnesses were --

7            MR. MCCLOSKEY:  Thought the illnesses were

8    real.

9            THE COURT:  She said she thought the father

10   thought the illnesses were real?

11           MR. MCCLOSKEY:  Correct.

12           THE COURT:  These are Shannon's words?

13           MR. MCCLOSKEY:  These are Shannon's words.

14           THE COURT:  Then?

15           MR. MCCLOSKEY:  And if he thought they were

16   real, he would have come to Florida.

17           THE COURT:  That part --

18           MR. MCCLOSKEY:  If he thought they were --

19           THE COURT:  If he thought they were real, he

20   would have come.  Now, that part concerns me because

21   she's telling him what someone else would have done; do

22   you understand what I'm saying?

23           MR. MCCLOSKEY:  Yes, I do.

24           THE COURT:  All right.  So the first part that

25   she says that the father thought they were real.

Tsai-Direct/McCloskey

1          MR. MCCLOSKEY:  Right.

2          THE COURT:  Do you object to that?

3          MR. CHAPMAN:  Judge, this is not

4  impeachment -- it is impeachment with an unsworn

5  statement, Your Honor, but I think the declarant

6  witness should have been asked that on direct and had a

7  chance to address it before they try to impeach her

8  with this witness.

9          MR. MCCLOSKEY:  He can cross-examine her on

10 those statements.

11         THE COURT:  No.  No, what he's saying is

12 Shannon should have been asked this.

13         MR. MCCLOSKEY:  Shannon made all kinds of

14 statements.

15         THE COURT:  I'm going to allow that.  All

16 right, that statement I'm going to allow.  Is there

17 anything else other than that because what someone else

18 would have done I'm not going to allow in?

19         MR. MCCLOSKEY:  No, that's fine.

20         THE COURT:  Okay.  So go ahead and lead.

21         (Open court).

22 BY MR. MCCLOSKEY:

23 Q.    Dezzerra, in this conversation with Shannon, did

24 she tell you that her father didn't know that her

25 illnesses were false or fake?

Tsai-Direct/McCloskey

1   A.     She did.

2   Q.     And did you question her closely about that?

3   A.     I did.

4   Q.     And directing your attention to near the end of

5   October 2015, did you get a call from Shannon about a

6   private -- about a private investigator?

7   A.     I did.

8   Q.     And what was that about?

9          THE COURT:  Let me see counsel.

10         (Sidebar conference).

11         MR. MCCLOSKEY:  In this conversation, Judge --

12         THE COURT:  Maybe we should do these all at

13   once.

14         MR. MCCLOSKEY:  Right.  This conversation, she

15   will say that she got a call from Shannon, that she

16   knew that a private investigator was going to try to

17   interview this witness and she told her not to

18   cooperate or talk to her father's investigator.

19      That she said -- that she told this witness she

20   had complete immunity and not to be concerned about her

21   father, he had his own accountants and lawyers.

22         THE COURT:  Government's position?  You're

23   going to open up this private investigator part, that's

24   fine.

25         MR. CHAPMAN:  I mean our position is it's

—Tsai-Direct/McCloskey—

1    hearsay.

2              MR. MCCLOSKEY:  I think it shows --

3              THE COURT:  I'm going to allow it, but I want

4    you to understand that you have been consistently

5    indicating that this private investigator business is

6    out-of-bounds.

7              MR. FRAWLEY:  This is a different one.

8              THE COURT:  I don't know anything, whether

9    it's different or not.  I'm just telling you very

10   clearly that without telling you what I'm going to

11   rule, I want you to be -- I want you -- I'm just giving

12   awe heads up I'm taking this into account.

13             (Discussion off the record between defense

14   counsel).

15             MR. MINA:  Thank you, Your Honor.

16             (Open court)

17             THE COURT:  Are there other questions?

18             MR. MCCLOSKEY:  I've got one more question.

19             THE COURT:  Okay.

20   BY MR. MCCLOSKEY:

21   Q.    Dezzerra, did Shannon ever tell you that you

22   shouldn't cooperate?

23   A.    She did.

24             MR. MCCLOSKEY:  I have no further questions.

25             THE COURT:  Thank you very much, Mr.

1    McCloskey.  Cross-examination.

2                       CROSS-EXAMINATION

3    BY MR. CHAPMAN:

4    Q.    Good afternoon.

5    A.    Hi.

6    Q.    Can you tell me how you say your last name again,

7    is it Sigh (sic) or Tie (sic)?

8    A.    Tsai.  The S is silent.

9    Q.    And ma'am, you've known Shannon since about 2008,

10   2009; is that right?

11   A.    Yes, sir.

12   Q.    And when you first met her, she didn't tell you

13   anything about any tax investigation, right?

14   A.    No.

15   Q.    But during that initial period of time when you

16   knew her, she did tell you that she had been sexually

17   abused by her father, right?

18   A.    She did.

19   Q.    And then she told you that she had been

20   emotionally and physically abused by both her mother

21   and father, correct?

22   A.    Yep.

23   Q.    And then she took that back and said the abuse

24   part of her mother was mostly emotional, not physical,

25   right?

Tsai-Cross/Chapman

1   A.    She did say both of them were mostly emotional.

2   Q.    But she didn't take back the sexual abuse

3   allegation; did she?

4   A.    She said none of that was true.

5   Q.    That was at a later date, right?

6   A.    No.  It was -- after that initial conversation,

7   yes.

8   Q.    At the time she made the admission to you about

9   the sexual abuse from her father, there was no criminal

10  investigation that you were aware of, right?

11  A.    Um, not that I'm aware of, no.

12  Q.    She didn't say I'm going to make up sexual abuse

13  allegations to help myself if I get investigated

14  sometime in the future; did she?

15  A.    She wouldn't say that, no.

16  Q.    Now, she said that -- you said that you were with

17  Shannon once where she handed you her phone, right?

18  A.    Yes.

19  Q.    And she said her father was on the other end,

20  right?

21  A.    Yes, sir.

22  Q.    And she asked you to pretend to be Nurse Mary?

23  A.    Yes.

24  Q.    And you found that odd, I take it.

25  A.    I did.  Quite odd to be honest with you.

Tsai-Cross/Chapman

1    Q.    Did you speak to her dad?

2    A.    Brief.  Just for a second.

3    Q.    What did he say?

4    A.    He said hello.

5    Q.    And did you say your name?

6    A.    No.  I said I love you and he said I miss you and

7    that's all I said.  That was the end of the

8    conversation.  I wanted no more to do with it.

9    Q.    All right.  And do you know Jenna Maldanado?

10   A.    I have seen her on -- twice on occasion at her

11   nail salon or tanning salon.  I'm sorry, tanning salon.

12   Q.    So when Shannon handed you the phone, she told

13   you they were just joking around, right?

14   A.    It was a prank that she was -- she and her father

15   felt was funny.

16   Q.    And now when she told you that -- hang on one

17   second.

18           MR. CHAPMAN:  May I have a moment?

19           THE COURT:  Yes.

20   BY MR. CHAPMAN:

21   Q.    When was the last time you spoke to Shannon?

22   A.    The last time I spoke to her was -- in-person?

23   Q.    Yes.

24   A.    Is when she moved out of my house.

25   Q.    What year?

Tsai-Cross/Chapman

1   A.      That was 2014.

2   Q.      Okay.  You haven't spoken to her since; is that

3   right?

4   A.      After that -- no, that's not true.  I'm sorry,

5   it's a little fuzzy with the years.  It's a long time

6   so I apologize.

7   Q.      The events you're talking about is a long time

8   ago too; right?

9   A.      Well, no.  This one -- yeah, the ones we were

10  talking about, yeah, they were a while ago, in 2009 and

11  2010.  But when she moved to my house, that was 2014

12  and she moved out.  So it was in 2015 she was talking

13  about a lawyer.

14  Q.      Okay.  And you haven't spoken to her since then?

15  A.      Oh, no.  I've spoken to her after that when I

16  talk to her with the lawyer, attorney.

17  Q.      Well, my question was when was the last time you

18  spoke to her.

19  A.      Last time I spoke to her was in 2015.

20  Q.      And you want nothing to do with Shannon, right,

21  at this point?

22  A.      I'm still friends with Shannon.

23  Q.      Pardon?

24  A.      I'm still friendly with Shannon.

25  Q.      Well, you don't really like her though; do you?

1    A.    No, I do like Shannon.  That's not true.

2    Q.    You've given two statements to Mr.  -- Dr.

3    Sabean's investigators, right?

4    A.    I didn't want anything to do with her after what

5    she had done to me, but yes.

6         MR. CHAPMAN:  Thank you.

7         THE COURT:  Thank you.  Mr. McCloskey,

8    redirect.

9                  REDIRECT EXAMINATION

10   BY MR. MCCLOSKEY:

11   Q.    And how long have you known Shannon, Dezzerra?

12   A.    I've known her for eight years.

13   Q.    And I think you said you interacted with her many

14   times; is that correct?

15   A.    Several times a week.

16   Q.    And how often did you speak with her during those

17   time frames?

18   A.    How often?

19   Q.    Yes.

20   A.    Oh, innumerable.  I can't even count.

21   Q.    Did you -- would she relate to you or tell you

22   various things during that timeframe that you knew or

23   did she tell you various facts?

24   A.    Yes.

25   Q.    And with regard to those things, were you later

1   able to determine whether those things were false or

2   true?

3   A.    They were almost always false.

4   Q.    And how would you say that you know Shannon; well

5   or not well?

6   A.    Extremely well.

7   Q.    And do you have an opinion of her character for

8   truthfulness?

9        MR. CHAPMAN:  Objection, Your Honor.

10        THE COURT:  Sustained.

11        MR. MCCLOSKEY:  May we approach, Judge?

12        THE COURT:  Of course.

13        (Sidebar conference).

14        MR. MCCLOSKEY:  Your Honor, I'm asking her an

15   opinion for truthfulness, not her reputation, and I

16   want to cite United States versus Watson, 669 F.2d 374,

17   United States versus McMurray, 20 F.3d 831,834.

18        THE COURT:  Do you expect me to read them as

19   we are standing here?

20        MR. MCCLOSKEY:  No, I'm just trying to make a

21   record.  I've looked up the basis to ask these

22   questions.  I think that I've laid a foundation.  I

23   think I'm entitled to ask it.

24        THE COURT:  Government's position?

25        MR. MCCLOSKEY:  It's not reputation.

Tsai–Redirect/McCloskey

```
 1              MR. CHAPMAN:  It's beyond the scope of my
 2   cross and it's a dated conversation.  It's a dated
 3   reference, a dated foundation and she doesn't have any
 4   basis to give an opinion about her reputation or her --
 5   for truthfulness today.
 6              THE COURT:  Under what rule is this
 7   admissible?
 8              MR. MCCLOSKEY:  608(b).
 9              THE COURT:  I'll look at it.  Is that it?
10              MR. MCCLOSKEY:  That's it.
11              THE COURT:  608(b) you're offering this under?
12   Is that a yes?
13              MR. MCCLOSKEY:  I think it's 608(b).
14              MR. MINA:  608(b).
15              THE COURT:  Is that a yes?  Okay, I'll take a
16   look.
17              MR. MINA:  Oh, excuse me.  608(a), Your Honor.
18   I misspoke.
19              THE COURT:  I'm reading it.
20              (Open court)
21              THE COURT:  You may answer.
22   A.   Can you ask the question again?
23   BY MR. MCCLOSKEY:
24   Q.   Do you have an opinion of her character for
25   truthfulness?
```

Tsai-Redirect/McCloskey

1   A.    My --

2         THE COURT:  That's a yes or no.

3   A.    Yes.

4   Q.    What's your opinion?

5   A.    She's a manipulative, compulsive liar.

6         THE COURT:  Hold it, hold it.  The jury will

7   disregard that.

8         MR. CHAPMAN:  Objection.

9         THE COURT:  Listen to the question.

10  A.    Okay, I'm sorry.

11        THE COURT:  Do you have an opinion as to her

12  character for truthfulness?  You said yes.

13  A.    Yes.

14        THE COURT:  What is the opinion?  We're

15  talking about truthfulness.  Just focus on the

16  question.

17  A.    She is not a truthful person.  Is that better?

18        THE COURT:  Any other questions?

19        MR. MCCLOSKEY:  No questions.

20        THE COURT:  Thank you.

21        MR. CHAPMAN:  Nothing further.

22        THE COURT:  Thank you.  You may step down.

23        THE WITNESS:  Thank you.

24        (End of excerpt)

25

1          **C E R T I F I C A T I O N**

2    I, Dennis Ford, Official Court Reporter for the United

3    States District Court, District of Maine, certify that

4    the foregoing is a correct transcript from the record

5    of proceedings in the above-entitled matter.

6    Dated:  November 10, 2016

7              /s/ Dennis Ford

8              Official Court Reporter